IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY R. IRWIN )<br>and OLIVIER MISSA )<br>51 Bedford Road )<br>Aberdeen, Scotland )<br>United Kingdom AB24 3LN )<br>       )<br>      Plaintiffs, )<br>       )<br>   v.   )<br>       )<br>WORLD WILDLIFE FUND, INC. )<br>1250 24th Street, N.W. )<br>Washington, D.C. 20037 )<br>       )<br>      Defendant. )<br>       )<br> ) | Civil Action No. _____ |

## COMPLAINT

Plaintiffs, Nancy R. Irwin ("Irwin") and Olivier Missa ("Missa") (collectively, "Plaintiffs"), through undersigned counsel, hereby bring this action against Defendant World Wildlife Fund, Inc. ("WWF" or "Defendant") for breach of contract, negligence and other relief, and states as follows:

## THE PARTIES

1.    Irwin is a citizen and resident of the United Kingdom. Irwin resides at 51 Bedford Road, Aberdeen Scotland, United Kingdom.

2.    Missa is a citizen of Belgium and a resident of the United Kingdom. Missa resides at 51 Bedford Road, Aberdeen Scotland, United Kingdom.

3.    WWF is a non-profit corporation incorporated under the laws of the State of Delaware. WWF is licensed to do business in the District of Columbia. On

information and belief, WWF's headquarters and principal place of business is in the District of Columbia.

## JURISDICTION AND VENUE

4. Jurisdiction of this action is proper pursuant to 28 U.S.C. Section 1332(a) in that this action is between a citizen of a state and the citizens or subjects of a foreign state, and the matter in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper pursuant to 28 U.S.C. Section 1391(a)(1) in that Defendant's headquarters and principal place of business are in the District of Columbia.

## ALLEGATIONS OF FACTS
## COMMON TO ALL COUNTS

6. Irwin is a highly-trained zoologist. Until the tragic events that give rise to this action, Irwin was a Commonwealth University scholar and doctoral candidate at the University of Queensland in Brisbane, Australia. Commonwealth scholarships are prestigious awards granted to citizens of member countries of the British Commonwealth to fully fund the cost of graduate school at universities in British Commonwealth member countries. Unusual for a graduate student, Irwin had raised all of her field costs and museum trips from conservation organizations and academic awards totaling $40,000.00. As of June 2002, Irwin had done substantial work on her doctoral thesis, including all data collection, a large portion of her analysis, written and submitted her first chapter, and had prepared three chapters of her thesis in draft form. Irwin had also discovered five new mammal species in a rare and endangered group.

7. Missa is a tropical ecologist and is married to Irwin. In or about January 2002, Missa contracted with The Smithsonian Institution and Enterprise l'Homme Tout Metier ("EHTM"), a contractor operating in Gamba, Gabon, to be the laboratory

coordinator for a biodiversity assessment and monitoring program funded by the Shell Foundation. On information and belief, Shell Foundation is a non-profit entity based in London, United Kingdom. Missa signed a one-year contract with The Smithsonian and EHTM.

7. In or about January 2002, Irwin and Missa moved from Brisbane, Australia to Gamba, Gabon so that Missa could begin working as the lab coordinator for The Smithsonian/EHTM biodiversity program. Gamba is a town in Gabon located in the "Gamba Complex", a large, remote area along the Atlantic coast in southwest Gabon. The Gamba Complex has a high level of biodiversity in plants, animals and insects, and was made part of a national park in 2002. Irwin, in the last stage of writing her doctoral thesis, left Australia on May 7, 2002 in order to accompany her husband in Gabon. While in Gabon, Irwin continued to do research on her doctoral dissertation. Irwin expected to finish her dissertation within eight to twelve weeks.

8. On information and belief, in 2002, WWF operated and controlled a biodiversity conservation program in the Gamba Complex. On information and belief, WWF's program in Gabon included operating an office with several staff in Gamba and running several programs. WWF also ran an "ecotourism" business out of its Gamba office, which included conducting "ecotours" in the Gamba Complex through an unincorporated entity called "Cecotour." On information and belief, WWF owned a small wooden boat that was used by WWF to conduct ecotours in the Gamba Complex. On information and belief, WWF acted as tour operator and booked trips on its boat. On information and belief, Cecotour was operated, controlled and funded by WWF. On information and belief, Cecotour was not a separate legal entity.

9. In or about the middle of June 2002, Missa arranged with WWF for a boat trip for himself, Irwin and two others on a lagoon adjacent to Gamba. Missa booked the trip with a WWF employee in WWF's office. Missa contracted with WWF to take them on the boat trip. Missa was instructed by a WWF employee when he made his booking to make payment to WWF. The boat was scheduled to depart early around 6:30 p.m. on June 28, 2002.

10. In the late afternoon of June 28, 2002, Missa was requested by Jean Bougeais, on information and belief, a WWF employee and director of its operations in Gamba and the manager of Cecotour, to open Missa's lab in order to meet with and brief United States Ambassadors from Cameroon, Gabon and Congo and a senior official from the United States State Department visiting Gabon. As a result of Bougeais's request, the boat trip departure time was postponed, which had unfortunate and tragic consequences for Irwin.

11. Despite the boat's scheduled departure time, WWF's boat did not leave until approximately 8:20 p.m., when it was dark. On information and belief, WWF's boat lacked any navigational lighting, which is in violation of Gabonese law. In addition, WWF's boat did not have any form of communication such as a functioning radio. The passengers were not offered or told to wear life jackets, even though this is required by Gabonese law. On information and belief, WWF's boat operator lacked adequate training, such as first aid and emergency planning.

12. On information and belief, shortly after WWF's boat embarked on its trip, it collided with a boat coming in the opposite direction. The bow of the oncoming boat struck Irwin in the face dislodging her orbital ridge and shattering her face. The bow of

the oncoming boat also hit metal supports for the roof of WWF's boat . One of the metal supports impaled Irwin's skull and tattooed her skin. During the collision, Irwin's shoulder was hit resulting in causing her spine to rotate. The force of the impalement knocked Irwin to the floor of WWF's boat causing further injury to her neck and the rear of her skull.

13. Because WWF's pilot's lacked emergency or first aid training, a passenger of WWF's boat had to take control of the situation, calm the pilot, and instruct him to return the boat to shore. Fortunately, Missa's first-aid training enabled him to keep Irwin breathing and alive.

14. Because WWF's boat lacked a working radio, it was impossible for the passengers or pilot to communicate with a nearby hospital in order to request emergency medical assistance. As a result, after the boat returned to shore, members of the boat party lost precious time in attempting to flag down a passing car and ask the driver to go to the nearby hospital and request emergency medical assistance.

15. Eventually, emergency medical assistance arrived from a nearby hospital but Irwin was refused entry because of her dire medical condition. She was then taken to Shell Gabon's medical center. However, Irwin's condition was so dire, that Shell employees operating in Gabon arranged for a helicopter to medivac her to a hospital in Port Genti, Gabon. Irwin was stabilized and had her first operation to clean and drain her five-centimeter open head wound. Irwin's condition was so dire that the doctors at Port Gentil did not think she could survive a flight to Europe. She was therefore medically evacuated to a hospital in Johannesburg, South Africa for emergency medical treatment. On information and belief, there are no brain surgeons in Gabon.

16. Irwin skull was severely injured as a result of the accident. Her physical injuries included a partial loss of bone, a severe fracture in the frontal region of her skull, serious injury to her brain, and damage to her spine and shoulder. Her medical complications included the development of meningitis and septicemia, a cerebrospinal fluid leak, and a herniated brain as a result of her skull fracture. Her treatment included removing a small portion of her left frontal lobe.

17. Irwin was discharged after spending approximately three weeks in hospital. Irwin underwent several extensive operations during her stay in hospital, and was in a "high trauma" intensive care unit for two weeks. Irwin returned to Gabon and then the United Kingdom shortly thereafter. Once her brain swelling had settled, Irwin underwent further plastic surgery and had a muscle graft, as well as the tattoos and ptosis removed from her face. Irwin has been following a rehabilitation program for the past two and one-half years. She has been treated in seven hospitals in Europe, and has needed an occupational therapist, neuropsychologist, psychologists, pain specialists and physiotherapists. Missa is currently in the process of hiring care assistants to help relieve him of some of his care-giving responsibilities for his wife.

18. Irwin has suffered severe and extensive long-term physical injury, pain and suffering and other injuries as a result of the accident. These injuries include, but are not limited to, the following: (i) extensive scarring; (ii) loss of sensation and motor function; (iii) asymmetrical facial expression; (iv) complete loss of smell and a diminished sense of taste; (v) significant pain in her shoulder, hand and neck; (vi) persistent headaches; (vii) fatigue; (viii) diminished cognitive skills; (ix) poor concentration; (x) short-term and working memory loss; (xi) diminution of her academic

abilities; (xii) diminished organizational skills; (xiii) her shattered sinuses cause complications with common infections; (xiv) diminished ability to perceive visual depth; and (xv) poor body positioning has led to sciatic pain; (xvi) behavioral lability resulting in her inability to control her moods; and (xvii) post traumatic stress.

19. As a result of her accident, Irwin is unable to return to her academic studies and research.  Accordingly, Irwin will be unable to pursue her career as a zoologist which she would otherwise been able to do but for the boat accident.

20. As a result of her accident, Irwin is unable to travel freely and independently.  The movement of trains and buses causes her to suffer spinal pain.  She is unable to drive or socialize independently.

21. As a result of her accident, Irwin is unable to purse many of her hobbies, including scuba diving, flute playing and piano playing.

22. In addition, Irwin is unable to obtain mortgage insurance, life insurance and travel insurance. She is unable to obtain medical insurance that would permit her to travel to the United States or Canada.  This precludes her from visiting relatives in the United States.

23. Missa also suffered damages as a result of the accident.  Missa's damages include, but aren't limited to, the expenses he had to incur as a result of Irwin's injuries.

### COUNT ONE
### Breach of Contract

24. Irwin repeats each and every allegation contained in all preceding paragraphs and incorporates the same herein.

25. Missa had a valid and enforceable contract with WWF when he contracted with WWF to purchased two tickets to ride on WWF's boat on June 28, 2005.

26. Irwin was a third-party beneficiary of the aforesaid contract.

27 It was an implied term of Missa's contract with WWF that it would operate its boat in a safe and careful manner.

28. WWF failed to operate its boat in a safe and careful manner by, inter alia, not having adequate lighting, traveling at night, not having a working radio, not offering life jackets to passengers, and not having an adequately trained pilot.

29. Plaintiffs have suffered damages as a result of WWF's breach of contract.

30. Plaintiffs continue to suffer damages as a result of WWF's breach of contract.

31. Wherefore, Plaintiffs demand judgment against WWF for such damages as may be proved at trial, attorney's fees, interest and costs, and for such other relief as the Court deems just and proper.

## COUNT TWO
### Negligence

32. Plaintiffs repeat each and every allegation contained in all preceding paragraphs and incorporates the same herein.

33. WWF owed Plaintiffs a duty to transport them safely on its boat.

34 WWF breached its duty to Plaintiffs by, inter alia, failing to operate its boat in a safe and careful manner, not having adequate lighting, traveling at night, not having a working radio, not offering life jackets to passengers, and not having an adequately trained pilot.

35. As a result of WWF's failure to operate its boat in a safe and careful manner, its boat crashed into another boat resulting in serious injury to Irwin. The

aforesaid crash would not have taken place if WWF had operated its boat in a safe and careful manner.

36. WWF also breached its duty to Plaintiffs when its employee delayed the departure of the boat until after it was dark.

37. Plaintiffs have both suffered damages as a result of the aforesaid crash.

38. Wherefore, Plaintiffs demand judgment against WWF for such damages as may be proved at trial, attorney's fees, interest and costs, and for such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

39. WHEREFORE, Plaintiffs respectfully request the following:

   (i) damages against Defendant;

   (ii) punitive damages against Defendant;

   (iii) pre-judgment and post-judgment interest;

   (iv) attorney's fees and costs; and

   (v) such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs respectfully request a jury trial as to each of the above counts.

       Respectfully submitted,


       _____
       Stephen H. Marcus, Esq.
       Bar No. 394419
       Law Office of Stephen H. Marcus
       1050 17th Street, N.W.
       Suite 600
       Washington, D.C.  20036

       Tel:   202-776-0651
       Fax:   202-331-7272
       E-mail: shmarcus@att.net

       <u>Counsel for Plaintiffs</u>

June 28, 2005