# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY R. IRWIN and )<br>OLIVIER MISSA, )<br><br>Plaintiffs, )<br><br>v. )<br><br>WORLD WILDLIFE FUND, INC. )<br><br>Defendant. ) | Case No. 1:05CV01287 (EGS) |

## PLAINTIFFS' OPPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT ON THE GROUNDS OF *FORUM NON CONVENIENS*

Plaintiff Nancy R. Irwin, an accomplished research zoologist, was brain-injured in June 2002 in Gabon in an accident aboard an ill-equipped boat owned by Defendant World Wildlife Fund, Inc. ("WWF") and operated by "Cecotour," an unincorporated entity controlled by WWF.   WWF's motion to dismiss this action on *forum non conveniens* grounds should be denied on two fundamental grounds:  First, Plaintiffs' choice of this forum merits deference because Irwin's precarious medical condition precludes her from traveling to Gabon without risking major medical complications or even death.   Second, an analysis of the "private interest" factors that are to be considered on a *forum non conveniens* motion shows that the balance overwhelmingly tips in favor of this forum, not Gabon.

## I.    **STATEMENT OF FACTS**

On the morning of June 28, 2002, Nancy Irwin woke up with a life full of promise and opportunity.  Irwin was an accomplished and highly-trained research zoologist on the verge of obtaining her doctorate.  Irwin and her husband Plaintiff, Dr. Olivier Missa, were living in Gamba, Gabon, where Missa was on contract with The Smithsonian Institution to run its biodiversity and monitoring program.  Irwin was looking forward to a two-day trip that Missa had booked with WWF on a small boat that WWF used as a means of transport, for research, educational projects, logistical support, and to conduct "ecotours" in a remote area of Gabon known as the "Gamba Complex."

That evening, and only a few minutes after their departure, Ms. Irwin's life, her future, and her well-being were shattered when WWF's boat, lacking proper navigational lighting, collided with an oncoming boat, grievously injuring Ms. Irwin's brain, skull and spine.  Ms. Irwin can no longer pursue her career as a research scientist, needs constant care, and is always at risk of medical complications that require sophisticated medical care and treatment.  While her husband wasn't physically injured, his life was forever changed by his wife's terrible injuries.

### A.  **Irwin's and Missa's Move to Gabon**

A 28-year old zoologist born in England, Irwin was, at the time of the collision, only a few months away from earning her Ph.D. at the University of Queensland in Brisbane, Australia.  Complaint ¶ 6.  Her studies were funded by a Commonwealth scholarship, a prestigious award granted to British Commonwealth citizens to fund fully the cost of graduate school at universities in British Commonwealth member countries. Id.  Unusual for a graduate student, Ms. Irwin raised $40,000 for her field costs and

museum trips from conservation organizations and academic awards.  Id.   As of June

2002, Irwin had done substantial work on her doctoral thesis, a study of the evolution and

ecology of an endangered family of bats – *Nyctimeninae*.  She had completed all data

collection as well as a large portion of her analysis, written and submitted her first

chapter, and had prepared drafts of three additional chapters.  Id.  As part of her doctoral

research, Ms. Irwin had discovered three new mammal species and a new genus in a rare

and endangered group.  She was in the process of writing a monograph on her discoveries

and remains the world's expert on this group.

In November 2001, Missa traveled to Washington, D.C. twice to negotiate a

contract with the Smithsonian Institution to be its laboratory coordinator at a biodiversity

and monitoring program in Gabon.  Id. at ¶ 7.   Irwin Declaration (Exhibit "D") ¶ 3.

Missa moved to Gabon soon after to begin work on the program and, on May 7, 2002,

Irwin, in the last stage of her doctoral thesis, left Australia to join her husband in Gabon.

Irwin continued working on her dissertation in Gabon.

Gabon is a West African country slightly smaller than Colorado, bordering the

Atlantic Ocean at the Equator, Equatorial Guinea, Cameroon, and the Republic of the

Congo.  Central Intelligence Agency, The World Factbook, Gabon,

http://www.cia.gov/cia/publications/factbook/geos/gb.html#top.  Only two autocratic

presidents have ruled Gabon since its independence from France in 1960. Gabon's current

President, El Hadj Omar Bongo Ondimba -- one of the longest-serving heads of state in

the world -- has dominated Gabon's political scene for almost four decades.  Id. at

http://www.cia.gov/cia/publications/factbook/fields/2028.html.  Although Gabon has a

higher per capita income than most sub-Saharan African nations, because of high income

inequality, a large proportion of the population remains poor.  Id.  at

http://www.cia.gov/cia/publications/factbook/geos/gb.html#top.  Travel in Gabon

presents a very high risk of malaria and also food or waterborne diseases, such as

bacterial diarrhea, hepatitis A, and typhoid fever.  Id.  Medical facilities, even in major

cities, are limited, and are adequate for only routine needs.  U.S. Department of State,

Bureau of Consular Affairs, Consular Information Sheet, Gabon,

http://travel.state.gov/travel/cis_pa_tw/cis/cis_1120.html.  Roads are hazardous, and

travelers may encounter civil unrest, violent crime, and carjackings.  Id.

 Despite the hardships of day-to-day life in Gabon, Irwin and Missa were drawn to

Gabon because of the vast biodiversity of its rain forests.  Complaint ¶ 7.  The two

scientists lived in Gamba, a town in the "Gamba Complex," a large area along the

Atlantic coast in southwest Gabon, rich in plants, animals, and insects.  Id.

### B.    The Boat Trip

 In mid-June 2002, Missa contracted with WWF for a boat trip for himself, his

wife, and two other scientists, Dr. Wim Bergmans, a Dutch mammalogist, and Mr.

Olivier Pauwels, a Belgian herpetologist, on a lagoon adjacent to Gamba.  Id. ¶ 9.  The

WWF is a non-profit corporation headquartered in Washington, D.C.  Id. ¶ 3.  WWF

operated an office with several staff people in Gamba who ran biodiversity conservation

programs in the area.   Id. ¶ 8.[1]  WWF also ran an "ecotourism" business out of its

Gamba office, which included conducting "ecotours" in the Gamba Complex through an

unincorporated entity called "Cecotour."   Cecotour was operated, controlled and funded

by WWF.  Id.   WWF owned a small wooden boat that it used, among other activities, to

---

[1] WWF's *forum non conveniens* motion admits that it managed a Central Africa Regional Program Office
in Libreville, Gabon from July 1, 1995 to June 30, 2002.   WWF Mot. Jamar Declaration ¶ 4.

conduct ecotours in the Gamba Complex.  <u>Id</u>. and Irwin Decl. (Exhibit D) Attachments A and B (Shell Gabon's accident investigation report and WWF's response confirming WWF ownership of the boat).   WWF booked boat trips from its office.  Missa booked a boat trip by telephone with Cecile Vautherin, a WWF volunteer.[2]  Ms. Vautherin instructed Missa to make payment directly to WWF after he returned from the tour.  Complaint ¶ 9; Missa Declaration ¶ 3.

The boat trip was scheduled to depart on June 28, 2002 at 6:30 p.m.  Complaint ¶ 9.   However, late that day, Jean Bourgeais, a WWF employee and the director of WWF's operations in Gamba and of Cecotour, asked Michelle Lee (the Smithsonian Institution's Gabon manager) to ask Missa to open his lab so that Missa could brief distinguished U.S.government officials including, the United States Ambassadors from Cameroon, Gabon and Congo and a senior official from the United States State Department -- who were visiting Gabon and wanted to see conservation programs being conducted in the region.  <u>Id.</u> ¶ 10.

While the U.S. officials were in Missa's lab, Bourgeais was in contact by telephone with WWF employee, Jean Tchibinda, the pilot of the WWF boat, and instructed him to wait until Missa's briefing was concluded and the visit was over.  In so doing, Bourgeais knowingly directed the WWF boat pilot to depart at night when visibility would be bad.  Irwin Decl.  ¶ 4.   The WWF boat trip departure time was postponed by almost two hours.  By the time the boat left the dock, it was 8:20 p.m. and night had fallen.  Complaint ¶ 11.  Contrary to Gabonese law, the boat, a small wooden craft capable of holding only a few passengers, had no navigational lighting.  <u>Id.</u>  Irwin

---

[2] Ms. Vautherin was a French student who worked for WWF in Gabon in 2002 and then returned to France.  On information and belief, she now lives on the French territorial island of Reunion, which is off the coast of Madagascar.

Declaration (Exhibit "D") Attachment "A" (Shell Gabon's accident report).   Also

contrary to Gabonese law, the passengers were not offered or told to wear life jackets.

Complaint ¶ 11.  When Irwin asked the WWF pilot if it was too late and too dark to

depart, he replied that he had piloted the boat at night before, that it was only 20 minutes

to their destination, a WWF guest house where they were to spend the night, and that he

had light.  It later emerged that the light he referred to was only a hand-held flashlight.

Irwin Decl. (Exh. "D") Attachment "A" (Shell Gabon investigative report).

         Within minutes of its departure, WWF's boat collided with a boat coming in the

opposite direction.  Complaint ¶ 12.  The bow of the oncoming boat struck Ms. Irwin in

the face, dislodging her orbital ridge and shattering her face.  Id.  The oncoming boat also

hit metal supports for the roof of WWF's boat, one of which impaled Ms. Irwin's head

and tattooed her skin.  Id.  During the collision, Ms. Irwin's shoulder was dislocated.  Id.

The force of the impalement knocked Irwin to the floor causing further injury to her neck

and the rear of her skull.  Id.

         The boat pilot, a WWF employee, lacked emergency and first aid training.  Id. ¶

13.[3]  Panicked by what had happened, the pilot was unable to deal with the situation.  Id.

Fortunately, a passenger on WWF's boat, Olivier Pauwels, was able to take control, calm

the pilot, and instruct him to return the boat to shore.  Id.  Fortunately also, Missa had

first-aid training, which enabled him to keep his wife breathing and alive.  Id.

         To the dismay of the passengers, WWF's boat lacked a radio, flare, or other

communication equipment capable of obtaining emergency help, so it was impossible for

the passengers or pilot to call for emergency assistance.  Id. ¶ 14; Irwin Decl. Attachment

_____

[3] The facts relating to the accident are also set out in the Gabonese police report (WWF Motion, Jamar
Decl.Exh. B, p.2), Shell Gabon's investigative report, and WWF's response.  Irwin Decl. Attachments A
and B.

"A."  As a result, members of the boat party lost precious time.   Complaint ¶ 14.

Emergency medical assistance eventually arrived to take Irwin and Bergmans to the

hospital, however they were both directed to Shell's medical center because the hospital

did not have the equipment or expertise to treat people in such a dire medical condition.

Id. at ¶ 15.  At Shell's medical center, doctors stabilized Irwin for evacuation and

arranged for a helicopter to medevac her to a hospital in Port Gentil, Gabon.

### C.   **Irwin's Injuries**

In Port Gentil, Irwin was stabilized and had her first operation to clean and drain

what turned out to be a five-centimeter open head wound.   Irwin needed to be flown out

of the country for further treatment.   Because the doctors from Irwin's medical insurance

company that coordinated her evacuation did not think she could survive a flight to

Europe, she was medically evacuated to a hospital in Johannesburg, South Africa for

further emergency medical treatment.   Id.

Irwin spent three weeks in the Johannesburg hospital – two of them in a "high

trauma" intensive care unit.  Id. ¶ 17.  Doctors in Johannesburg diagnosed an impaled

impacted contaminated head injury consisting of a compound and depressed skull

fracture with driven in skull fragments. Fogiel Decl. (Exhibit "A") ¶ 3. Subsequently,

other doctors diagnosed a severe whiplash that caused hyperextension of Ms. Irwin's

neck, as well as spinal and shoulder damage.  Id.

Irwin underwent immediate surgery to clean and drain her head wound, and then

further operations to reconstruct her orbit (the area around the eye), and remedy skull and

muscle loss.  Id.  Irwin also suffered several medical complications, the most serious of

which was a cerebrospinal fluid leak ("CSF leak").[4]  The CSF leak caused her brain to herniate through the anterior fossa.  Id.  Irwin also developed meningitis, large hematomas (blood clots resulting from bleeding inside the brain), and gangrene, which required that part of her frontal lobe be removed.  Id.  She also developed septicemia, and went into septic shock.

Following her discharge from the Johannesburg hospital, Ms. Irwin returned to Gabon and to the United Kingdom shortly thereafter.  Complaint ¶ 17.  Once her face had sufficiently recovered, Irwin underwent further plastic surgery, a muscle graft, and had the tattoos excised and ptosis corrected from her face.  Id.[5]

Since her accident, Ms. Irwin has been following an extensive rehabilitation program. She has been treated in seven hospitals in Europe, and is now under the treatment of occupational therapists, a neuropsychologist, a psychologist, a maxillofacial surgeon, a plastic and reconstructive surgeon, a rehabilitation specialist, pain specialists and two physiotherapists, one of whom treats her in her home.  Fogiel Decl. (Exhibit "A") ¶ 5.  Irwin's social worker has arranged for someone to provide her with 12 hours of home care a week to help with her physiotherapy program, supervise her walking outdoors, household chores, drive her to hospital appointments, planning and organizing. This assistance is necessary to reduce the care burden on her husband, Missa, who has been diagnosed with and is under treatment for depression as a result of the strain of coping with Irwin's condition.

Despite this therapy, Irwin will suffer for the rest of her life from the severe and extensive physical injuries and pain resulting from the accident.  Id. ¶ 18.  She has lost

---

[4] A CSF leak is the escape of fluid that surrounds the brain and the spinal cord from cavities of the brain or from the central canal in the spinal cord.  Fogiel Decl. ¶ 3.
[5] A ptosis is where the skin or muscles from the forehead sag into the line of vision of the patient.

9

the nerves in her left forehead and therefore is paralyzed in this portion of her face.  Her

face is scarred, and she has an asymmetrical facial expression.  Id.  She has completely

lost her sense of smell and lost some of her sense of taste.  Id.  She has so much pain in

her shoulder, hand, neck and legs, including sciatic pain, that she has to take morphine

and undergo acupuncture.  Id.; Fogiel Decl. ¶ 5.   She has persistent headaches and

suffers from excessive fatigue. Complaint ¶ 18.  Moreover, since the accident, Ms. Irwin

is very prone to infection.  Fogiel Decl. ¶ 6.  This year alone, she has had eight different

infections indicating that her immune system is compromised.[6]  Id.   As a result of nerve

damage, Irwin's tongue occasionally spasms causing her to choke and vomit.  She has

significant problems with a faculty known as "proprio-perception."  This faculty allows a

person to be unconsciously aware of their limbs, posture and movement.  Irwin must

control these functions consciously and is undergoing intensive therapy to try to relearn

this awareness.  In the meantime, Irwin misjudges distances, drops and breaks things,

walks into things, and frequently falls.  Irwin requires constant care and attention from

her doctors and other care-givers.  Id.

        Worst of all, Irwin's mental functions have been irreparably compromised by the

accident.  Irwin's cognitive skills are impaired.  Id. ¶ 18.  Her concentration skills have

been altered, and she has difficulty focusing in noisy or busy environments.  She has

short-term and working memory loss, and diminished organizational skills.  Id.  Irwin

also suffers psychological effects from the accident, including post-traumatic stress

---

[6] Ms. Irwin is in the process of consulting a maxillofacial surgeon to assess whether her frequent infections
are due to her body rejecting foreign material that was put in her skull to stabilize bone grafts and to repair
bone loss caused by the accident.  Fogiel Decl. ¶ 6.  If surgery is required to address this problem, Ms.
Irwin will be at serious risk of infection for several months.  Id.

disorder (Fogiel Decl. ¶ 4), and an inability to control her emotional state as is typical of frontal lobe damage.  Complaint ¶ 18.

As a result of the neurological and psychological damage caused by the accident, Irwin has been unable to return to her academic studies and research.  Complaint ¶ 19. She is unlikely to finish her Ph.D. dissertation.  Id.  She will never lead expeditions again in remote jungles.   She will never have a teaching post, or pursue further zoological research.  Id.  Irwin will also never pursue her hobbies, including traveling around the world, scuba diving, flute playing and piano playing.  Id. ¶ 21.  Her visual problems are such that she will never drive a car again and has difficulty walking outside unaided.

**D.    Irwin's decision to sue in Washington, D.C.**

Earlier this year, Irwin began to contemplate a lawsuit against WWF that would compensate her for the financial hardships caused by the accident.  Ms. Irwin considered filing the lawsuit in Washington, D.C. or in Gabon.  She ruled out Gabon for a simple reason: she can't travel to Gabon and participate in her own lawsuit because it is too risky on medical grounds.  Her only realistic alternative is to pursue the lawsuit in Washington.

Dr. Peter Fogiel, Ms. Irwin's treating physician in Scotland, and Dr. Paul Marie Loembe, a neurosurgeon and head of the only neurosurgery department in Gabon, both caution that, in their medical opinion, Ms. Irwin must not travel to Gabon.  If she did, she would be at serious risk of medical complications, and even death.  Fogiel Decl. ¶ 11; Loembe Decl. (Exhibit "B") ¶¶ 4-5.  Gabon does not have adequate medical care for routine conditions, much less doctors with the expertise or sophisticated medical equipment to treat Irwin if she develops any medical complications arising from her condition. Fogiel Decl. ¶ 10; Loembe Decl. ¶ 3.

Any travel is difficult for Irwin.  The movement of trains and buses causes her spinal pain.  Complaint ¶ 20.  The ascent and descent of an airplane and accompanying changes of pressure in the cabin, causes nose bleeds and pain in her face, likely due to Irwin's damaged sinuses which no longer function properly.  Fogiel Decl. ¶ 7.  A more serious potential consequence of flying is the risk of a CSF leak.  Id.  If a CSF leak were to develop, Irwin would be at risk of encephalitis.  This can be fatal if not treated promptly.  Id.

In the event of a medical complication such as a CSF leak, Irwin would need sophisticated medical care, access to CAT scan equipment, a neurologist to diagnose the precise problem, and a highly-trained neurological surgeon and an aseptic surgical theater to correct the problem.  Id.   To manage her pain and condition, Irwin also requires specialized physiotheraphy to keep her mobile, prevent her from vomiting, reduce muscle spasms, and to free and stretch trapped nerves in order to manage her pain and condition.  Id.

Because her immune system is compromised, if Irwin traveled to Gabon she would be at risk of developing serious complications from infectious diseases that are common in Gabon.  Id. ¶ 8.  These include malaria (including cerebral malaria), typhoid fever, bacterial diarrhea, and hepatitis A.  Irwin's ability to fight infection is diminished, and she suffers from excessive fatigue, thereby exposing her to tropical diseases.   As Dr. Fogiel notes, this would be unwise and risky.  Id

 Ms. Irwin's might also experience harmful psychological trauma if she returned to Gabon.  People who suffer post-traumatic stress syndrome can re-experience their

ordeal in the form of flashbacks, nightmares, or frightening thoughts when they are exposed to places or events that are reminiscent of the trauma. Id. ¶ 9.

Dr. Fogiel and Dr. Loembe are emphatic that Gabon has neither the medical expertise nor the sophisticated equipment that Irwin needs for her regular care needs or if complications were to develop. Fogiel ¶ Decl. 10; Loembe Decl.¶ 3. Dr. Loembe has testified that Irwin would be at risk of meningitis, encephalitis, malaria, yellow fever, typhoid fever, and other complications linked to her weakened immune system. Loembe Decl. ¶ 3. Dr. Loembe also states that, in addition to the risk of infection, if Irwin developed any complications that required surgery, she could not be treated in Gabon. Id. ¶ 4. Irwin's only option would be a medical evacuation to Johannesburg, which would be expensive, difficult to arrange, and involve a delay that could jeopardize her life. Id.

The foregoing intolerable risks to Irwin's health or life aren't present if she litigates her case here. Irwin could be treated at any one of several Washington hospitals. Fogiel Decl. ¶ 12. In addition, Irwin has an aunt, uncle and several cousins in Northern Virginia who could host and care for her during deposition and trial. Irwin Decl. ¶ 9. Her aunt and one of her cousins are registered nurses, and could be especially helpful in providing medical care. Id.

## II.    ARGUMENT

This Court should not dismiss this action on the grounds of *forum non conveniens*. Irwin's choice of forum deserves deference, despite the fact that she isn't a U.S. citizen, because, for health reasons, this forum is dramatically more convenient to her than

Gabon.  Further, an analysis of *forum non conveniens* factors demonstrates that this

forum is more convenient than Gabon.

### A.    The Analytical Framework

To decide a motion on grounds of *forum non conveniens*, a court must perform a

four-step test.  Pain v. United Technologies Corp., 637 F.2d 775, 784-85 (D.C. Cir.

1980).  First, the court must establish whether an adequate alternative forum exists which

has jurisdiction over the whole case.  Id. at 784.  Second, the court must consider all

relevant factors of private interest, "weighing in the balance a strong presumption against

disturbing plaintiffs' initial forum choice." Id.  Third, if the balance of private interests is

"in equipoise or near equipoise," id., the court must determine whether the public interest

factors tip the balance in favor of a trial in a foreign forum.   Fourth, if that is the case, the

court must ensure that the plaintiff can reinstate his or her suit in the alternative forum

without undue inconvenience or prejudice.  Id. at 785.

There is a strong presumption in favor of the plaintiff's choice of forum.

Although this presumption has less force if the plaintiff is foreign (Piper Aircraft Co. v.

Reyno, 454 U.S. 235, 265-66 (1981)), "[t]he Court's language that a foreign plaintiff's

forum selection deserves less deference is not an invitation to accord a foreign plaintiff's

selection of an American forum no deference since dismissal for *forum non conveniens* is

the exception rather than the rule." Wright, Miller & Cooper, Federal Practice and

Procedure: Jurisdiction § 3828, at 291-92 (2d ed. 1986).  See also Murray v. British

Broadcasting Corp., 81 F.3d 287, 290 (2d Cir. 1996) *(*at least "some weight must still be

given to a foreign plaintiff's choice of forum"); R. Maganlal & Co. v. M.G. Chem. Co.,

942 F.2d 164, 168 (2d Cir. 1991) (defendant must still show that the balance of

convenience sufficiently favors trial in the foreign forum to overcome the presumption in favor of plaintiff's choice); Lony v. E.I. DuPont de Nemours & Co., 935 F.2d 604, 609 (3d Cir. 1991) (holding that in cases involving foreign plaintiff, defendants must establish a "strong preponderance" in favor of dismissal); In re Air Crash Disaster Near New Orleans, 821 F.2d 1147 n. 26 (5th Cir. 1987).[7]

The defendant bears the burden of proof "on all elements of the *forum non conveniens* analysis." Hassan El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 677 (D.C. Cir. 1996) (quoting Reid-Whalen v. Hansen, 933 F.2d 1390, 1394 (8th Cir. 1991)); I.T. Consultants, Inc. v. Islamic Republic of Pakistan, 2003 U.S. Dist. LEXIS 23500 * 24 (D.D.C.  Feb. 2, 2003) ("defendant has the burden on all aspects of the motion to dismiss on *forum non conveniens* grounds"), aff'd in part and rev'd in part on other grounds, 351 F.3d 1184 (2003).

The Supreme Court has stressed that the doctrine of *forum non conveniens* is "flexible," Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249 (1981), and that "[each] case turns on its facts." Id., *quoting* Williams v. Green Bay & Western R. Co., 326 U.S. 549, 557 (1946).  Since the *forum non conveniens* decision requires a court to balance many

---

[7] In Piper, the Supreme Court's analysis of the deference issue shows that it is dependent on whether the plaintiff's choice of forum is truly convenient.  The Court stated:

> In Koster, the Court indicated that a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum (citation omitted).  When the home forum has been chosen, it is reasonable to assume that the choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable.

Id. at 255-56.  The Supreme Court has, thus, made clear that the assumption of convenience and therefore deference to the plaintiff's choice of forum should not be automatic in the case of a foreign plaintiff because the foreign plaintiff, by definition, has not chosen the "home" forum.  It follows, however, that where the foreign plaintiff's choice is shown to be more convenient for the plaintiff than the foreign forum, deference should be accorded to the foreign plaintiff's forum choice.

considerations related to fairness and convenience, <u>Piper</u> at 249, the decision is committed to the sound discretion of the district court. <u>Id.</u> at 257.

### B.    The Court Should Defer To Irwin's Choice of Forum

Irwin chose this forum because it is dramatically more convenient to her in light of the health risks in going to Gabon. Plaintiffs are not engaged in forum shopping, and WWF does not argue otherwise.[8]

The medical risks attested to by Dr. Fogiel and Dr. Loembe provide conclusive and unassailable evidence that Washington, D.C., not Gabon, is the more convenient forum. In light of this showing, <u>Piper's</u> rationale for giving less deference to a foreign plaintiff's choice of forum is inapplicable because this forum is unquestionably more convenient for Plaintiffs than Gabon. In these circumstances, this Court should defer to Irwin's choice of forum, despite her foreign nationality.[9]

As set forth in the Statement of Facts, Irwin's health and life would be at risk if she were to travel to Gabon. This compelling medical reason makes Gabon a *forum non conveniens* for Irwin.

Dr. Fogiel, a general practitioner who has treated Irwin on a regular basis for over two and one-half years, states:

> It is my medical opinion that Ms. Irwin should not travel to Gabon. If she
> did, she would be at serious risk, including the possibility of death, due to
> the lack of adequate medical expertise and facilities. The medical care she

---

[8] The D.C. Circuit noted in <u>Pain</u> that the reason why a plaintiff's forum has presumptive rather than conclusive weight is to avoid forum shopping. The court stated: "In short, trial judges applying the doctrine of *forum non conveniens* must walk a delicate line to avoid implicitly sanctioning forum-shopping by either litigant at the expense of the other." <u>Pain</u>, at 784.

[9] In contrast, in <u>BPA Int'l, Inc.</u> v. <u>Sweden</u>, 281 F. Supp. 2d 73, a case on which Defendant relies regarding the degree of deference to be given to a foreign plaintiff's forum choice (Def. Mot. at 11), there was no compelling reason for the plaintiffs, a British citizen and a New York citizen, as well as the New York company they owned, to sue in Washington, D.C. and not in Sweden.

would need is far from routine, and would require a high degree of
expertise and sophisticated medical equipment to address those needs.

Fogiel Decl. ¶ 11. And Dr. Loembe, the head of the only neurosurgery department in

Gabon, states:

In my opinion, Ms. Irwin should not, under any circumstances, travel to
Gabon.  The risks to her health are too great, and I would advise strongly
against her coming her.

Loembe Decl. ¶ 5.

Publicly-available information about Gabon confirms Irwin's doctors'

unequivocal conclusions.  For example, the website for the Hospital for Tropical Diseases

at University College London Hospitals reports that medical care in Gabon is

"substandard throughout the country even in the best medical facilities. . . .  In the event

of serious medical conditions every effort should be made to go to Western Europe.

Shortages of routine medications and supplies may be encountered."

http://ww.thehtd.org/travel.  The United Kingdom's Foreign and Commonwealth Office

reports that "medical facilities are limited.  Water-borne diseases, malaria and HIV/AIDS

are prevalent."  www.britishhighcommission.gov.uk.  And the U.S. State Department

reports that "[m]edical facililites in Gabon's major cities are limited."

http://travel.state.gov.travel/cis_pa_tw/cis/cis_1120.html.

By contrast, Irwin has access to qualified doctors, well-equipped medical

facilities, and a supportive family in Washington, D.C.   Fogiel Decl. ¶ 12; Irwin Decl. ¶

11.

In light of Irwin's compelling medical, psychological, and practical reasons for

bringing this action in Washington, D.C., and the risks to her life and health that she

would incur by litigating in Gabon, this Court should defer to her choice of forum.

C.      **Defendant Has Failed To Discharge its Burden of**
        <u>**Showing That Gabon is An Adequate Alternative Forum**</u>

Defendant attempts to discharge its burden of proof on whether Gabon is an

"adequate" forum by stating that it is willing to submit to the jurisdiction of the Gabonese

courts, that the Gabonese legal system is based on the French civil code, and that

Plaintiffs' claim are recognized causes of action in Gabon.  Mot. 7-9.  But this is

insufficient in the face of the United States State Department's finding of governmental

influence and corruption in the Gabonese judiciary.

On March 28, 2005, the State Department submitted a report to Congress on

human rights, including in Gabon.[10]   The State Department said the following about

Gabon and its judicial system:

> Gabon is a republic dominated by a strong presidency.  The Gabonese
> Democratic Party (PDG) has remained in power since 1968 and has
> circumscribed political choice.  PDG leader El Hadj Omar Bongo
> Ondimba, president since 1967, was reelected for a seven-year term in a
> 1998 election marred by irregularities.  President Bongo is the longest
> serving head of state in Africa.  In July of 2003, parliament passed a
> constitutional amendment removing the provision that had limited the
> president to two terms in office.
>
> The Government of Gabon's human rights record remained poor.
> Although there were some improvements, serious problems remained.
> Security forces reportedly beat and tortured prisoners and detainees,
> arbitrary arrest and detention remained concerns, and <u>the judiciary</u>
> <u>remained subject to government influence.</u>  Forced labor, child labor and
> trafficking – particularly in children – remained problems.
>
> . . .
>
> <u>The Gabonese legal system is slow, inefficient, and subject to corruption</u>.
> The United States has encouraged greater transparency and respect for
> human rights in contacts with Gabonese law enforcement agencies and
> also encouraged information sharing in weapons smuggling and child-
> trafficking.

---

[10] The State Department is required by statute to submit an annual report to Congress on actions taken by
the United States Government to encourage respect for human rights abroad.

(Emphasis added.)  U.S. State Department, Bureau of Democracy, Human Rights and Labor, Supporting Human Rights and Democracy:  The U.S. Record 2004-2005 (March 28, 2005) http://www.state.gov/g/drl/rls/shrd/2004/43108.htm.

While the courts in this district and elsewhere have noted that "general allegations of corruption in the judicial system" aren't sufficient to establish that a foreign forum is inadequate (El-Fadl v. Centr. Bank of Jordan, 75 F.3d 668, 678 (D.C. Cir. 1996)), the evidence in El-Fadl fell far short of the State Department's finding with respect to Gabon. In El-Fadl, the foreign plaintiff relied on a State Department report that expressed "'concern about the impartiality' of the Jordanian court system."  Id. at 678.[11]  The evidence here of courts being subject to governmental influence and corruption is much more specific and of far greater concern.[12]

In light of these disturbing findings, WWF's showing of "adequacy" is insufficient.  Defendants should not have to contend with a legal process that is subject to governmental influence and corruption.  Accordingly, WWF's motion should be dismissed for failure to satisfy its burden that Gabon is an adequate alternative forum. See, e.g., Eastman Kodak Co. v. Kavlin, 978 F. Supp. 1078, 1087 (S.D. Fla. 1997)

---

[11] El-Fadl, in turn, relies on Blanco v. Blanco Industrial de Venezuela, 997 F.2d 974 (2d Cir. 1993) for the proposition that a general allegation of corruption is insufficient.  In Blanco, the plaintiff contended that there was corruption, delay and expense in the Venezuelan justice system.  The Second Circuit refused to find that Venezuela was an inadequate forum, noting that it was "anomalous" that the plaintiff, a Venezuelan corporation, had in its contracts with the defendant, a Venezuelan bank, a provision stating that any litigation between them could be brought in Venezuela.  Id.  at 981.  The Second Circuit also noted that there are a number of cases holding that Venezuela is an adequate forum.  Id. at 981-82.  There are no reported cases on whether or not Gabon is an "adequate" forum.

[12] We note that in El-Fadl, the D.C. Circuit stated that a foreign forum would be inadequate if it "would deny him access to its judicial system on the claims in his complaint."  Id.  at 678.  Plaintiffs do not make this assertion with respect to their claim.

(denying a *forum non conveniens* motion on the grounds that the defendant had failed to satisfy its burden of proof that Bolivia was an adequate forum).

### D.  The  Pain "Private Interest" Factors Weigh Decisively in Irwin's Favor

In Pain, the D.C. Circuit set forth the private interest factors that are to be considered in conducting a *forum non conveniens* inquiry.  They are as follows:

> The relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

Pain, 637 F.2d at 782 (quoting Gilbert, 330 U.S. at 508).   We discuss each of these factors in turn.

### 1.  Relative Ease of Access to Sources of Proof

To analyze this factor, we need to address the issues that will be litigated at trial. See, e.g., Pain, 637 F.2d at 786 ("To evaluate whether the district judge correctly appraised the relative ease of access to sources of proof, we must first understand what theories of the case each party will seek to prove in the alternative forums"); Friends For All Children, Inc. v. Lockheed Aircraft Corporation, 717 F.2d 602, 607-08 (D.C. Cir. 1983) (analyzing the access of proof factor in light of liability and damages issues in the case).

This action involves two categories of issues – liability and damages.  We discuss these below.

### Liability Issues

The declaration of Gilbert Erangah, a Gabonese attorney, establishes that under Gabonese law, WWF is liable for Irwin's damages if the following facts are established:

(i) Missa booked the tickets with WWF; (ii); WWF owned the boat in which Plaintiffs were riding; (iii) the boat was piloted by a WWF employee; and (iv) the boat lacked navigational lighting.  Erangah Decl. (Exhibit "C") ¶ 3.

    <u>Missa Booked the Tickets With WWF.</u>    This is an important threshold issue of contract formation.  As noted in Mr. Erangah's declaration, "[u]nder Gabonese law, a 'transporter' is required to transport its passengers safely, and is responsible for any damages to its passengers if it fails to do so.  Erangah Decl. ¶ 3.[13]  Accordingly, if Missa contracted with WWF there is, in essence, a strict liability standard that applies obviating the need for further proof on liability.

    There are two witnesses to this issue:  Missa and Vautherin, the person at WWF's office with whom Missa booked the trip.  Vautherin was a French student who worked in WWF's office in 2002 and then returned to France.  Missa Decl. (Exhibit "E") ¶¶ 3-5. As indicated above, she lives on the French territorial island of Reunion.  Her testimony can be obtained pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (28 U.S.C.§ 1781) ("Hague Convention") since both the United States and France are signatories.[14]    However, her testimony could not be compelled if this dispute is litigated in Gabon since it is not a signatory.

---

[13] A commentator on French civil law writes that "in a contract of transport the obligation of the transporter was to carry the person or the goods safe and sound to the destination."  Barry Nicholas, <u>French Law of Contract</u>, p.49 (London: Butterworths 1982).

The legal authority for transporter liability under the French Civil Code is found in a decision of France's Cour de Cassation, France's highest court, in a 1911 opinion in which the court stated that "the execution of the contract of transport indeed involves the obligation of the carrier to conduct the traveler safely to his/her destination."  Exhibit "H" hereto.

[14] Since Reunion is a part of France, we assume that the Hague Convention applies there.  <u>See</u>, http://europa.eu.int/abc/maps/regions/france/mer_en.htm.   For a list of signatories to the Hague Convention, see http://travel.state.gov/law/info/judicial/judical_702.html.

WWF's Ownership of the Boat.  Prima facie evidence of WWF's ownership of the boat is already a matter of record in this case.  Irwin's declaration includes an investigative report, dated July 10, 2002, prepared by Shell Gabon about the accident and WWF's response, dated July 19, 2002.  Irwin Decl. Attachment A and B.  In its report, Shell Gabon states that the boat was owned by WWF.  In its response, WWF not only does not dispute this statement, it embraces it by stating that the oncoming boat "cut-off the WWF boat" and that "WWF boats are used by government agents and WWF-paid ecogardes for surveillance and anti-poaching missions."[15]

If further evidence of ownership is necessary, such evidence may be located in Washington at WWF's headquarters.[16] And to the extent evidence of ownership may be in Gabon, it is reasonable to assume that WWF-World Wide Fund for Nature ("WWF International"), the entity to which WWF allegedly transferred its Gabonese operation on July 1, 2002 (Mot. Jamar Decl. ¶ 5), would be amenable, at WWF's request, to producing it.[17]

---

[15] WWF does not contend that its Gabonese operation was conducted through a separate entity.

[16] We note that the police report states that the boat in which Plaintiffs were riding "belonged to Ecotourisme (Cecotour) of Gamba."  Mot. Exhibit B.  This apparent inconsistency may be resolved by the fact, according to the Shell report, the boat was owned by WWF but allegedly rented to Cecotour.  To the extent there is an issue as to Cecotour's legal status, WWF's records in Washington of its Gabon activities may include documentation about Cecotour.

[17] WWF continues to have a ongoing role in Gabon.  In July of 2005, a team of top WWF officials, including its senior vice president, went to Gabon where they toured a national park with "WWF Gamba team and partners," met Shell Gabon senior management to "review the implementation of WWF/Shell joint action plan in the area," met with the Gabonese Deputy Minister of Forestry Economy, the U.S. deputy ambassador, the French facilitator of the Congo Basin Forest Partnership, and officials from the National Park Council.  The WWF team also met with "WWF Minkebe staff and field partners" in order to review conservation operations in northern Gabon.  WWF CARPO Newsletter (Exhibit "G" hereto), July 2005, p.2.  Thus, although WWF contends that it has no "legal ability to compel production of documents from the WWF office in Gabon" (Mot. 3 n.2) that WWF formerly ran, it plainly has an ongoing and close relationship with personnel in WWF-World Wide Fund for Nature's Gabon operation.

A WWF Employee Piloted the Boat.   There is already evidence in the record that the pilot was a WWF employee.  The Gabonese police report refers to the pilot as "an employee of WWF Gamba."  The Shell investigative report refers to "WWF boat drivers."  And while WWF's report refers to the pilot as the "Cecotour driver," a record of his employee status, if one exists, could well be in Washington.

Further, Jean Bourgeais, the director of WWF's operations in Gamba and of Cecotour, would likely be able to provide relevant testimony on this issue.  Mr. Bourgeais lives in France.  Irwin Decl. ¶ 7.  Thus, his testimony could be compelled pursuant to the Hague Convention if this case is litigated here.  This important witness could not be compelled to testify if the litigation were to proceed in Gabon.

The Boat Lacked Navigational Lighting.   This evidence is already in the record. Shell's investigative report found that the lack of navigational lighting was the "direct cause" of the accident.  Its report states:

> Neither of the 2 boats had (sufficient) navigational lighting.  The WWF boat had a handheld torch (which was used at the time of the incident) as means of lighting, the other boat had none.  The lack of (proper) navigational lighting makes these boats unsuitable for trips during the hours of darkness.  Lack of visibility is therefore more than likely the direct cause for this incident.

Irwin Decl. Attachment "A."  Importantly, WWF's response to Shell's report does not contradict this finding.  In light of the documentary evidence that is already available, and WWF's tacit admission, there is no need to litigate this dispute in Gabon in order to resolve this issue.

Other Liability Issues.   With respect to negligence-related issues, several potential witnesses live in the Washington, D.C. area, a key witness lives in Holland, and another witness is in Gabon but is willing to come to Washington to testify.

As discussed above, a key event was the fact that the boat trip was delayed while Missa briefed several high-level U.S. government officials.  During the briefing, Jean Bourgeais was in telephone contact with the boat pilot and told him to hold the boat until the briefing was completed.  Three participants in the briefing, Jeffry Burnham, a senior State Department official, David H. Kaeuper, at the time, the U.S. Ambassador to the Republic of the Congo, and Kenneth P. Moorefield, at the time, the U.S. Ambassador to Gabon, live in the Washington area.  Mr. Burnham lives in Alexandria, VA.  Mr. Kaeuper lives in the District of Columbia. And Mr. Moorefield lives in Potomac, MD.  Irwin Decl. ¶¶ 4-6.  The foregoing witness may be able to testify that they heard Mr. Bourgeais direct the pilot to hold the boat until the briefing was completed.  Such testimony would help show WWF's control over the pilot and boat, and its knowledge, through Bourgeais, that it was knowingly sending its passengers on a trip at a time when there would not be good visibility.  These three witnesses are all subject to compulsory process that can be issued by this Court.  Fed. R. Civ. P. 45(b)(2).  None of these witnesses could be compelled to testify in Gabon.

There were two other passengers on the boat who could provide relevant testimony.   Dr. Wim Bergmans was injured in the accident and had to be flown out of Gabon along with Irwin.  Dr. Bergmans lives in Holland.  Irwin Decl. ¶ 8.  His testimony can be obtained via the Hague Convention since the Netherlands is a signatory.  He could not be required to give testimony if the case were litigated in Gabon.  The other passenger, Olivier Pauwels, is currently in Gabon.  In his attached declaration, he states that he is willing to come to Washington to testify.  Pauwels Decl. (Exhibit "F") ¶ 6.

To the extent there is a need to adduce evidence as to the actual crash, the Gabonese police report, Shell Gabon's report and WWF's response provide most of the information of relevance. These documents include a detailed map showing the path of the two boats involved in the accident, the location of the accident, the distance of the point of impact from shore, the time of the accident, the identities of the pilots, the extent of damage to the boats, how the accident occurred, the causes of the accident, including lack of visibility, insufficient navigational lights and the actions of the oncoming boat. While there are some points of disagreement among the reports, there is no dispute that the accident happened when it was dark, there was a lack of visibility, both boats lacked adequate navigational lighting, the WWF boat did not have a functioning radio, and the oncoming boat rammed into the WWF boat.[18]

In light of the foregoing, WWF is plainly wrong in contending that WWF would be "substantially disadvantaged" because certain non-party witnesses "that are crucial" to WWF's case are in Gabon. Mot. 13. Testimony from the pilot of the oncoming boat isn't "crucial" because there is no dispute that the oncoming cut in front of WWF's boat. Further, Pauwels, Bergmans and Missa can testify on this issue. Nor is testimony needed from the police "and other local investigators" (Mot. 13) since we already have their reports. Nor is testimony from "medical personnel" at Shell Gabon and Port Gentil or "passing motorists" necessary (id.) since their testimony would have no bearing on liability and little, if any, relevance to damages.

---

[18] The areas of disagreement appear to be limited to whether the passengers were advised to postpone the trip, whether the WWF pilot was experienced, and whether the passengers were asked to wear life vests. On these issues, there are potentially six witnesses – Bourgeais, the WWF pilot, Irwin, Missa, Bergmans and Pauwels. Two of these witnesses are parties, two live in Europe, one (the pilot) presumably lives in Gabon, and one is currently in Gabon but is willing to come to Washington. Certainly, with respect to these few points of disagreement, there is no basis for contending that access to proof is more easily obtained in Gabon than in Washington. Further, none of these issues bears on whether WWF is liable.

**<u>Damages Issues</u>**

Since WWF's liability flows from a handful of facts that are not likely to be at issue (<u>see</u> Erangah Decl. ¶ 3), damages issues will predominate in this case   This case will focus primarily on the accident's physical, psychological, professional and economic impact on Irwin.  To prove her damages, Irwin will need the testimony of expert witnesses.  These will include a trauma consultant, a neurologist, a neuropsychologist, a psychologist or psychiatrist, a maxillofacial surgeon, a plastic and reconstructive surgeon, a rehabilitation consultant, a physiotherapist, and an economist.   Irwin Decl. ¶ 9.  None of these witnesses will likely be in Gabon given the lack of sophisticated medical expertise there.  They are far more likely to be in the United Kingdom, where Irwin resides, and is already receiving care from medical professionals who could serve as her witnesses.  <u>See</u> Fogiel Decl. ¶ 5.   Experts in all of these areas are also available in the United States.

Forcing Irwin to litigate in Gabon would be prejudicial to her given that U.K. medical personnel who are treating her, and who might otherwise be able to serve as her experts, may be unwilling to travel to Gabon.  It is far more likely that such witnesses would be willing to travel to Washington, D.C. in view of the risks in Gabon.  These risks include civil unrest, violent crime, carjacking, armed attacks, credit card fraud, robbery, limited medical facilities, hazardous road conditions, and infectious diseases.  U.S. Department of State, Bureau of Consular Affairs, Consular Information Sheet, Gabon. <u>http://travel.state.gov/travel/cis_pa_tw/cis/cis_1120.html</u>; Fogiel Decl. ¶ 8.

In sum, an examination of the issues in this case shows that the balance of convenience on the issue of relative ease of access to sources of proof weighs heavily in

favor letting this action proceed in Washington.  On liability, three key witnesses are in Europe and subject to the Hague Convention, three witnesses are in the Washington, D.C. area, WWF is headquartered here and therefore likely to have relevant documents, and another key witness is willing to come from Gabon to testify.  As to damages, which will likely constitute the bulk of the evidence presented, the testimony will come from Irwin, Missa and their experts, none of who reside in Gabon.

      **2.**        **Availability of Compulsory Process and Impleader**

WWF's argument that this action should be dismissed because it cannot implead the owner and operator of the other boat is unavailing because their participation is not required in order for it to defend the case.  As set forth in the Declaration of Gilbert Erangah, the liability issues here are whether Missa contracted with WWF, whether WWF owned and operated the boat, and whether the boat lacked navigational lighting.

The question of whether the owner and operator of the oncoming boat are also liable will have no effect on WWF's liability.  Their liability can be litigated separately in Gabon without compromising WWF's defense in this case.  This is very different than in Pain and the other cases on which WWF relies, where joinder of the third party defendant "is crucial to the presentation of [the] defense" because the defendant might "be relieved from liability altogether."  Id. at 790; see also, Piper, 454 U.S. at 259 ("If Piper and Hartzell can show that the accident was not caused by a design defect, but rather by the negligence of the pilot, the plane's owners, or the charter company, they will be relieved of all liability"); DeMelo v. Lederle Labs., 801 F.2d 1058, 1063 (8th Cir. 1986) ("Although litigation in this country would afford de Melo greater access to sources of proof relevant to *her* theory, it would box out Lederle from access to concededly

important evidence upon which its defense may rest"); <u>Frazier</u> v. <u>St. Jude Medical, Inc</u>., 609 F. Supp. 1129, 1131 (D. Minn. 1985) (inability to implead third-party defendants "prevents St. Jude from presenting an effective defense in this court").

The facts of this case, as they pertain to the issue of interpleader, are more analogous to those in <u>Reid-Walen</u> v. <u>Hansen</u>, 933 F.2d 1390 (8th Cir. 1991). In that case, the plaintiff was swimming near the beach area of a Jamaican hotel when she was struck by a motorboat, not associated with the hotel. The plaintiff sued the American owners of the hotel in the United States, alleging that they breached their common law duty of care by failing to prevent motorboats from traveling through the hotel swimming area, and that they had violated Jamaican law by failing to provide a lifeguard and by failing to place buoys around the swimming area. The Court of Appeals reversed the district court's dismissal of the action on *forum no*n *conveniens* grounds. The Eight Circuit explained:

> The plaintiff's allegations all go to the duty to provide a safe environment for swimming, which is an independent question from whether the boat driver was at fault for striking Reid-Walen . . . . Although perhaps more inconvenient, the [defendants] can pursue a separate indemnification action against the boat driver in the courts of Jamaica.

<u>Id.</u> at 1398.

Likewise, WWF's liability is entirely independent of whether the other boat is also at fault. WWF won't be "prejudiced" if it is unable to litigate in this action a separate claim against the owner or operator of the other boat. <u>Pain</u>, at 791. The fact that it may be more convenient to WWF to litigate this action and an impleader action in one proceeding, cannot overcome the fact that as to this action, Washington is the more convenient forum.

As to compulsory process, as we noted above, six witnesses are subject to compulsory process in Washington, D.C. but not in Gabon – Jean Bourgeais, Wim Bergmans, Cecile, Jeffry Burnam, David Kaeuper and Kenneth Moorefield.

### 3.    There is No Need to View the Accident Scene

Viewing the accident scene is unnecessary to establish WWF's liability.  The core facts of the accident are already available from the reports prepared by the Gabonese police, Shell Gabon and WWF, and are not in dispute. These are all facts of record, and there is absolutely no need to travel, not only to Gabon, but to Gamba, a remote village within Gabon, to view the scene of the accident.[19]

### 4.    Other Practical  Problems

Irwin would face an enormous practical problem if she had to litigate this dispute in Gabon – she is unable to go there in order to participate in the litigation.

The federal courts have recognized that in circumstances where the plaintiff is unable, for reasons such as physical disability, economic hardship, fears of reprisal or safety or psychological hardship, to travel to the foreign forum, the action should not be dismissed on *forum non conveniens* grounds.

For example, in <u>Reid-Walen</u> v. <u>Hansen</u>, 933 F.2d 1390 (8th Cir. 1991), the court gave "particular significance" to the fact that the plaintiff would have difficulty litigating in Jamaica.   The court stated at 1398 n.11:

> Because the doctrine of *forum non conveniens* is to be an instrument of justice, however, courts must be sensitive to the realities of the plaintiff's  position.  An individual like Reid-Walen who was severely injured while on vacation is in a very different practical and economic position from a large multinational corporation engaging in a worldwide business.

---

[19] Missa, Bergmans and Pauwels can also provide testimony, if necessary.

See also, Schexnider v. McDermott Int'l, Inc., 817 F.2d 1159, 1163 (5th Cir. 1987) ("a trial in Australia [of a maritime action by an injured crewman] would in all likelihood be a hardship to Schexnider who is apparently not in good health."); Castanho v. Jackson Marine, Inc., 484 F. Supp. 201, 207 (S.D. Tex. 1980), aff'd in part and appeal dismissed in part, 650 F.2d 546 (5th Cir. 1981) ("This decision [to deny *forum non conveniens* motion in maritime case brought by injured seaman] is reinforced by the injustice in requiring the Plaintiff, a paraplegic, to forgo suit in the forum of his choice so that he might be cast about to find justice elsewhere"); Adkins v. Service Wire Co., 2002 U.S. Dist. LEXIS 21089, *14 (S.D. W. Va. 2002) (motion to transfer venue to Houston denied where plaintiff was quadriplegic and "it will be practically impossible for James Adkins to attend a trial in Texas"); Nikac v. Pozzi, 172 F. Supp. 2d 414 (S.D.N.Y. 2001) (motion to transfer venue from Manhattan to Westchester denied where  paraplegic permanently confined to a wheelchair can travel more easily to Manhattan); Chesler v. Trinity Indus. Inc., 1999 U.S. Dist. LEXIS 10587, *5 (N.D. Ill. July 6, 1999) (motion to transfer venue to Nebraska denied where plaintiff was basically confined to his home in a wheelchair, and travel would be "more than simply inconvenient; it would be both extremely challenging and costly").

Courts have also refused to dismiss actions on the grounds of *forum non conveniens* where the plaintiff feared for his or her personal safety if the case had to be filed in a foreign forum.  In Iragorri v. United Technologies Corp., 274 F.3d 65, 75 (2d Cir. 2001) (en banc), the Second Circuit remanded the case for consideration of various factors, including the plaintiffs' fear for their personal safety in Columbia and their concern that witnesses might be unwilling to travel there.  The court held that "if these

concerns are warranted, they appear highly relevant to the balancing inquiry that the

District Court must conduct"). See also, Rasoulzadeh v. Associated Press, 574 F. Supp.

854, 861 (S.D.N.Y. 1983), aff'd, 767 F.2d 908 (2d Cir. 1985) (*forum non conveniens*

motion denied because "if the plaintiffs returned to Iran to prosecute this claim, they

would probably be shot"); Cabiri v. Assasie-Gyimah, 921 F. Supp. 1189, 1199 (S.D.N.Y.

1996) (declining to dismiss on *forum non conveniens* grounds stating that "[p]resuming

Cabiri's allegations to be true, he would be putting himself in grave danger were he to

return to Ghana to prosecute this action"); Galvis Mujica v. Occidental Petroleum Corp.,

381 F. Supp.2d 1134 (C.D.Cal. 2005) (holding that foreign forum is inadequate if

plaintiffs can't pursue claim without fear of retaliation).[20]

    The psychological hardship of having to litigate in a foreign forum where the

plaintiff's injuries arose has also been held to be an important factor.  Thus, in Wilcox v.

Holiday Inns, 1998 U.S. Dist. LEXIS 3105 *5-6 (S.D.N.Y. March 17, 1998), the plaintiff

was attacked and sexually assaulted in the Bahamas.  The court held that "a change of

venue to the Bahamas would require Lillian Wilcox to return to the place of her alleged

attack.  In a case involving allegations of psychological trauma caused by that attack, the

Court acknowledges plaintiffs' desire to proceed close to their home."

    Underlying these cases is the judicial recognition that a plaintiff should not be

forced to litigate in a foreign forum if it would be an undue hardship.  The physical and

psychological risks that Irwin would confront in Gabon are surely as great as the

difficulties faced by the plaintiffs in the cases cited above.  Accordingly, the "practical

---

[20] In Galvis Mujica, the court held that there does not have to be "an absolute certainly that Plaintiffs would
be harmed if they returned [to the foreign forum proposed in a *forum non conveniens* motion]: a significant
possibility would be sufficient." Id. at 1143.  Irwin has certainly established a "significant possibility" that
she could suffer physical or psychological harm if she were to go to Gabon.

difficulties" component of the private interest analysis weighs heavily against dismissal of this action.

Nor would it be a valid response for WWF to argue that Irwin could litigate in Gabon via a videotape deposition.  This argument flies in the face of the U.S. courts' recognition of a litigant's right to attend his or her trial in person.  While this right isn't absolute, it is of such importance that it is analyzed under the due process clause of the constitution.  Thus in <u>Helminski</u> v. <u>Ayerst Labs</u>, 766 F.2d 208, 213 (6th Cir. 1985), albeit not a *forum non conveniens* case, the Sixth Circuit held that "a court may not exclude arbitrarily a party who desires to be present merely because he is represented by counsel; such exclusion would violate the due process clause of the Fifth Amendment."   And implicit in the "practical difficulty" cases cited above (where presumably, the courts could have ruled that the plaintiffs "attend" via deposition), is the recognition that a plaintiff has the right to participate in and attend her own trial.

The right of a litigant to attend his or her trial was addressed in the venue context in <u>Adkins</u> v. <u>Service Wire Co.</u>, 2002 U.S. Dist. LEXIS 21089 (S.D. W. Va. 2002).  In <u>Adkins</u>, the plaintiff, a West Virginia truck driver, became a quadriplegic as a result of injuries sustained while unloading wire reels in Texas.  The defendant was a West Virginia corporation that had contracted with the plaintiff's employer to transport wire reels from West Virginia to Texas and empty reels back to West Virginia.  The plaintiff was hospitalized in Texas for several months.  The court denied defendant's venue motion[21] to transfer the action to Texas, stating as follows:

> Perhaps most significantly, in this case it will be practically impossible for James Adkins to attend a trial in Texas, as opposed to

---

[21] The venue factors applied by the district court are very similar to the private interest factors applied in <u>Pain</u>.

merely inconvenient (albeit significantly inconvenient) for Texas witnesses to attend a trial in West Virginia.  A plaintiff has a legitimate and significant interest in attending his own trial.  As such, the interests of justice, another important[t] factor in determining proper venue, are better served by retaining venue in this district. While a civil litigant does not possess an absolute right to attend his own trial, courts have frequently held that "a court may not exclude arbitrarily a party who desires to be present merely because he is represented by counsel; such exclusion would violate the due process clause of the Fifth Amendment" (citing <u>Helminski</u>).

In sum, Irwin's inability to travel to Gabon, and judicial recognition of hardship considerations and a litigant's right to participate in her own trial, tips the balance of private interest factors overwhelmingly in favor of allowing Irwin to litigate this dispute here.

### D.  <u>There is No Need To Consider Public Interest Factors</u>

Only if the balance of private interests is "in equipoise or near equipoise," must the court determine whether the factors of public interest tip the balance in favor of a trial in a foreign forum.  <u>Pain</u> at 784.  As demonstrated above, the balance of private interest factors tips decidedly in favor of this forum.

We note, however, that there is a public interest in holding corporations responsible here for violations of foreign laws abroad.  As the court in <u>Reid-Walen</u> noted "[t]he defendant's home forum always has a strong interest in providing a forum for redress of injuries caused by its citizens."  <u>Id</u>. at 1400.  This "public interest" particularly obtains in Washington, D.C., home to numerous non-profit corporations with overseas operations.

Further, this is not a case where the litigants have no connection to this jurisdiction.  Plaintiffs moved to Gabon after Missa came to Washington to negotiate a contract with The Smithsonian Institution.  The boat was owned by a corporation that is

headquartered here and which may have relevant documents here.  The instruction to delay the boat such that it departed in darkness without navigational lighting was given in the presence of three U.S. governmental officials who reside in the Washington area.

Finally, the fact that this Court would have to apply Gabonese law (which is based on French civil law) is not a reason to dismiss the case.  <u>Piper</u>, 454 U.S. at 260 n.29 ("Of course, this factor alone is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate"). As the court noted in <u>Manu Intern. S.A.</u> v. <u>Avon Products, Inc</u>., 641 F.2d 62, 68 (2d Cir.1981) "[w]e must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform."

## CONCLUSION

Deference to Plaintiffs' choice of this forum and an analysis of private interest factors both lead to the conclusion that Defendant's motion should be denied and this action allowed to proceed in this forum.


Respectfully submitted,



_____/s/_____
Stephen H. Marcus, Esq.
D.C. Bar No. 394419
Law Office of Stephen H. Marcus
1050 17th Street, N.W.
Suite 600
Washington, D.C.  20036

Ph:     202-776-0651
Fax:    202-331-7272
E-mail:shmarcus@att.net

Counsel for Plaintiffs

December 20, 2005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of December, 2005, I served the following

counsel with Plaintiffs' Opposition To Defendant's Motion To Dismiss The Complaint

on the Grounds of *Forum Non Conveniens* by filing it on the U.S. District Court for the

District of Columbia's Electronic Case Filing System:

    Robert A. Salerno, Esq.
    DLA Piper Rudnick Gray Cary
    1200 19th Street, N.W.
    Washington, D.C.  20036

    Rodney E. Gould, Esq.
    Rubin, Hay & Gould
    205 Newbury Street
    P.O. Box 786
    Framingham, MA  01701

               _____/s/_____
               Stephen H. Marcus