# EXHIBIT "D"

# NANCY IRWIN DECLARATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY R. IRWIN and <br> OLIVIER MISSA, <br><br> Plaintiffs, <br><br> v. <br><br> WORLD WILDLIFE FUND, INC. <br><br> Defendant. | Case No. 1:05CV01287 (EGS) |

## DECLARATION OF NANCY R. IRWIN

I, Nancy R. Irwin, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Plaintiff in this action. I live in Aberdeen, Scotland with my husband, Olivier Missa.

2. On 28 June 2002, I was seriously injured in a boat accident in Gabon. The facts relating to my accident and the nature of my injuries are set forth in the Complaint and the Declaration of my doctor, Dr. Peter C. Fogiel. I make this declaration to provide additional factual information that is relevant to World Wildlife Fund, Inc.'s ("WWF") motion to dismiss this action on the grounds that Gabon is allegedly a more convenient forum to litigate this dispute.

3. My husband (Dr. Olivier Missa) and I went to Gabon after Olivier negotiated a one-year contract with The Smithsonian Institution to be the laboratory coordinator for a biodiversity assessment and monitoring program in Gabon. Olivier visited Washington, D.C. twice in November 2001 to negotiate his contract.

2

4. WWF's contention that the key witnesses are in Gabon, and that there are no witnesses located in the United States, is incorrect. Dr. Jeffry M. Burnam is a potential witness and, on information and belief, he lives in Alexandria, Virginia. Dr. Burnam was at the time the Deputy Assistant Secretary for Environment in the Bureau of Oceans and International Environmental and Science Affairs in the U. S. State Department. http://www.state.gov/g/oes/rls/12214.htm. On information and belief, Dr. Burnam, is currently a Special Advisor for Environment and Development in the Bureau of African Affairs, U.S. Department of State http://www.foia.state.gov/mms/OrgDirectory/OrgDir.asp?ID=25. Dr. Burnam was one of the United States visitors who toured Olivier's lab on the day of my accident. As set forth in the Complaint, in the late afternoon of June 28, 2002, Jean Bourgeais, a WWF employee and director of its operations in Gamba and the manager of Cecotour, asked Michelle Lee, (Gabon manager for the Smithsonian Institution ) to ask Olivier, to open the laboratory in order to meet with and brief United States Ambassadors from Cameroon, Gabon and Congo and a senior official from the U.S. State Department. Dr. Burnam was the senior official from the U.S. State Department. I attended Olivier's briefing. During the briefing, Mr. Bourgeais during a phone call instructed Jean Flavian Tchibinda, the pilot of the boat on which we were to travel, to hold the boat until after the briefing was completed. In so doing, Mr. Bourgeais knowingly directed the WWF boat pilot to depart at night in a boat that lacked navigational lighting. Dr. Burnam was in the room at the time Mr. Bourgeais had that call.

5. David H. Kaeuper is another witness whose testimony may be relevant. Mr. Kaeuper was also member of the U.S. delegation that visited Olivier's lab on June

28, 2002. At that time, Mr. Kaeuper was the United States Ambassador to the Republic of the Congo. On information and belief, he is currently the U.S. State Department's International Facilitator for the Congo Basin Forest Partnership. http://www.state.gov/g/oes/rls/25867.htm. Like Dr. Burnam, Mr. Kaeuper's testimony may be relevant to establishing WWF's liability because he was in Olivier's lab when Mr. Bourgeais directed the WWF boat pilot to hold the boat on which we were to travel until the briefing was completed. On information and belief, Mr. Kaeuper lives in the District of Columbia.

6. Kenneth Price Moorefield is another witness whose testimony may be relevant. Mr. Moorefield also visited Olivier's lab on June 28, 2002. At that time, Mr. Moorefield was the United States Ambassador to Gabon, and on information and belief, he is currently a consultant. Like Dr. Burnam and Mr. Kaeuper, Mr. Moorefield's testimony may be relevant to establishing WWF's liability. On information and belief, Mr. Moorefield lives in Potomac, Maryland.

7. Jean Bourgeais's testimony will also be important in this case. On information and belief, Mr. Bourgeais no longer lives in Gabon. In August 2002, after my accident, I spoke to Mr. Bas Huijbregts, Mr. Bourgeais' replacement in WWF's Gamba office. Mr. Huijbregts informed me that Mr. Bourgeais left Gabon after the boat accident and returned to France with his family. On information and belief, Mr. Bourgeais currently resides in France.

8. Dr. Wim Bergmans is another key witness who doesn't live in Gabon. As the police report attached to WWF's motion states, Dr. Bergmans was another person in the boat who was injured in the accident. Dr. Bergman suffered an open head wound and

a cracked vertebrae in his neck. Like me, Dr. Bergmans had to be flown out of Gabon in order to receive emergency medical treatment. On information and belief, Dr. Bergmans lives in Holland where he is the curator of mammals at the Amsterdam Museum, and also works for the International Union for the Conservation of Nature (IUCN). If Dr. Bergmans' testimony is necessary, it would be far more convenient for him to travel from Holland to Washington, D.C. than to Libreville, Gabon.

9. Olivier Pauwels, a herpetologist currently working in Gabon for the Smithsonian Institution, is a key witness. Mr. Pauwels was a passenger on the boat. (There were a total of four passengers on the boat apart from the pilot – Dr. Bergmans, Mr. Pauwels, Olivier and me.) Mr. Pauwels was also in the laboratory giving a talk to the US delegation before the accident. Mr. Pauwels spent extensive periods of time working for WWF in Gabon between 2001 and 2004. Mr. Pauwels has advised that he is willing to come to Washington, D.C. to testify in my case. Mr. Pauwels went with the Gabonese police and Mr. Jean Bourgeais of WWF to make statements about the accident, while Dr. Bergmans, my husband and I were medically evacuated.

10. Mr. Pauwels was also involved in an investigation conducted by Shell Gabon when I was in intensive care in South Africa. Shell Gabon's report, dated 7 July 2002, is Attachment "A" hereto. WWF prepared a response, dated July 19, 2002, and is Attachment "B" hereto. The foregoing reports both state the boat in which we were riding was owned by WWF.

11. In addition to the reasons set forth in Dr. Fogiel's declaration, it would be much more convenient for me to litigate this dispute in Washington, D.C. than in Gabon because I have an aunt, uncle and several cousins living in northern Virginia. If this

4

action is allowed to proceed, I can stay with my relatives who can help take care of me while I am here for deposition or trial. In fact, my aunt and one of my cousins are registered nurses.

12. In order to litigate my damage claims, I will need the help of many expert witnesses. These will likely include the following: (i) a trauma consultant to testify to the nature of the multitude of fractures and complex infections I suffered immediately post injury; (ii) a neurologist to testify as to the nature and extent of the injuries I suffered to the brain, proprioception, senses such as olfaction, taste, vision and touch, and the long term impact of those injuries; (iii) a neuropsychologist to testify to the long term cognitive impact of my injuries and my need for personal assistants and electronic aids; (iv) a psychologist or psychiatrist to testify to the fact that I suffer post-traumatic stress disorder as a result of the accident and need ongoing treatment to come to terms with my altered potential and facial disfigurement; (v) a maxillofacial surgeon to testify to future surgical operations I may require as a result of my injuries; (vi) a plastic and reconstructive surgeon to testify to further plastic surgeries I may require; (vii) a rehabilitation consultant and a physiotherapist to testify as to my ongoing need for physical and occupational therapy; and (viii) and an economist to testify to my loss of income due to my inability to continue in my chosen profession as an academic scientist, and other economic losses such being uninsurable, unable to drive or take public transportation, and a massive reduction in my ability to pursue my hobbies and interests.

13. It will be far more likely that expert witnesses will be willing to travel to Washington, D.C. to testify rather than Gabon in light of the risks in Gabon. These risks include civil unrest, violent crime, carjacking, armed attacks, credit card fraud, robbery,

limited medical facilities, and hazardous road conditions. U.S. Department of State, Bureau of Consular Affairs, Consular Information Sheet, Gabon. http://travel.state.gov/travel/cis_pa_tw/cis/cis_1120.html.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 18th December 2005

Nancy R. Irwin

# ATTACHMENT "A"

| | |
|---|---|
| From: | HSE dept. |
| To: | |
| Date: | 10-7-'02 |
| Subject: | Boat accident 28-6-'02 |

### 1. Description of incident:

On 28-6-'02 a boat accident occurred on the N'dogo lagoon (close to P1) involving a boat owned by WWF and another boat owned by a private person. These boats collided, resulting in serious injuries for 2 passengers in the WWF boat and some damage to the boats. The injuries were so serious, that the 2 persons had to medevaced, also in the other boat an injury occurred, which could be treated locally. The 2 persons that were medevaced, were visitors of the Smithsonian Institute, currently working with Shell Gabon on a biodiversity project.

Though the incident is completely outside the managerial span of control of SG (not work-related and not involving any company assets, SG's involvement was necessary in order to organize the medevac of the injured persons, which implicitly means the exposure of people to certain risks (i.e. helicopter flight, ambulance, etc.). Despite the fact that the incident is not reportable or recordable, it was still decided to participate in the investigation of the incident, also because there is a friendly relation between SG and WWF and SG employees regularly use the WWF facilities to observe the local wildlife.

### 2. Main causes:

- The incident occurred in the hours of darkness. The boat trip was supposed to take place in the (late) afternoon, but due to late arrival of some visitors it was postponed to early evening

- Neither of the 2 boats had (sufficient) navigation lighting. The WWF boat had a handheld torch (which was used at the time of the incident) as means of lighting, the other boat had none. The lack of (proper) navigation lighting makes these boats unsuitable for trips during the hours of darkness. Lack of visibility is therefor more than likely the direct cause for this incident.

### 3. Contributory findings:

- The boat involved in the incident, is owned (and insured) by WWF, but it was rented out to Cecotour (who organized this trip). WWF had not made any demands to Cecotour on the use of the boat. WWF representatives stated that they normally would not go out on night trips, it is unclear to what extend this message is also communicated to Cecotour.

- The driver of the boat was said to be very experienced, however after the accident had occurred he seemed unsure on how to proceed. One of the Smithsonian representatives more or less took over from the driver, by ordering him to return to the nearest access point for land transport (i.e. ambulance).

- The WWF boat is not equipped with a functioning radio. It is therefor lucky that the incident occurred relatively close to Gamba and that the boat was still serviceable after the collision. Even so, the response to the incident was rather haphazard; after having gone ashore, with the injured people still in the boat, the Smithsonian representative halted 3rd party cars on the nearest road and requested them to contact the hospital. If the incident had occurred further away from Gamba, the consequences could have been much more serious due to lack of proper means of communication. Please note that for the same reason SG's pleasure boats have recently been equipped with a radio.

- Though life vests were available, the passengers were not obliged to wear one. Again, luckily, none of the passengers fell in the water after the incident, which could have easily happened. In that case, not wearing a life vest could have worsened the consequences of the incident.

- In the Smithsonian party, a number of persons should have been aware of the conditions (and thus the hazards) under which this trip was going to be made. However nobody vetoed the trip (i.e. postpone till the morning).

- Though of no consequences for this investigation, the report drawn up by the local gendarmerie holds the other boat driver responsible for the incident.

### 4. Way forward:

It is recommended that WWF undertake corrective action, to prevent these incidents from happening*. These actions would mainly comprise:

- Avoid night trips on the N'dogo lagoon as much as possible. If a night trip is absolutely necessary, the boat should be equipped at least with 360 degrees round-shining top light.

- (Re-) install the radio on the boat and instruct boat drivers how to use it.

- It is recommended that WWF boat drivers receive training in which they are instructed in basic First Aid and how to handle in case of (serious) incidents.

- Boat driver and passengers should be instructed to wear a life vest at all times.

* SG (HSE dept) may assist WWF reviewing and implementing corrective actions

# ATTACHMENT "B"

## **Comments on Shell's HSE dept. report on Boat accident 28/06/02**

WWF –Gamba
19/07/02

**General**

**2. Main causes**
We should add :
- Non-respect of driving rules by the other boat. As shown on the police reports 'map', that boat should not have been on this side of the lagoon but stay on the right site of the water. It basically cut-off the WWF boat.

**3. Contributory findings:**
Rectifications:
1. Cecotour did communicate to its passengers that it would be wise to postpone the trip to the next morning. It was the passengers who strongly insisted leaving at night.
2. The driver is experienced and went to the nearest point for help. This is the embankment of the market in Gamba, which is the nearest embarkation of the Gamba dispensary. This was also the nearest point to where WWF & Smithsonian, Shell, WCS and State Department people where to be reached.
3. At arrival, the Cecotour driver found the first car who helped with its front lights to give visibility to every one still on board. While the Cecotour driver left off to alert the doctor of the Dispensary, a Smithsonian stopped a second car.
4. People where asked to wear life vests. It was the passengers who refused.

**Way forward:**
- WWF is a technical partner of the Wildlife Department and of the local association Cecotour. WWF boats are used by government agents and WWF-paid ecogardes for surveillance and anti-poaching missions. WWF would suggest to extend these trainings to MINEF people in Gamba and Sette Cama, as well as to Cecotour people.